# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

_____

VICTORIA DAVIS,

      Plaintiff,

v.                                        Civil No. 03-885 WJ/RHS

SAN JUAN COUNTY GOVERNMENT,
THOMAS HAVEL, in his Official and
Individual Capacity, JACK FORTNER,
in his Official and Individual Capacity,
and TONY ATKINSON, in his Official
and Individual Capacity,

      Defendants.

## MEMORANDUM OPINION AND ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court pursuant to Defendants' Motion for Summary Judgment [Docket No. 20]. Having reviewed the submissions of the parties and being otherwise fully advised on the law, I find that the motion is should be granted in part and denied in part as set forth is this Memorandum Opinion and Order.

## BACKGROUND

Plaintiff began her employment with San Juan County (County) sometime around July 6, 1999 when she was hired as a Juvenile Monitor at the Juvenile Community Corrections Program. Sometime around the period between January 7 and January 11, 2002, Plaintiff was promoted by

Defendant Thomas Havel to the position of Acting Manager of the DWI Facility.[1]  When Plaintiff took over as Acting Manager of the DWI Facility, the facility was, in Plaintiff's words, a "mess." There were budget and staff problems.  According to Plaintiff, she had a good working relationship with Havel, and any relationship issues she had with subordinate staff were the result of her efforts to correct problems at the facility.

Defendants contend that Plaintiff's work performance was deficient because, within a month of her promotion, Plaintiff's subordinates at the DWI facility were complaining of Plaintiff's leadership style, and complaints continued throughout the period of Plaintiff's employment at the facility.  According to Defendants, complaints were received indicating that Plaintiff was abrasive, rude and abrupt.  Defendants state that Havel issued Plaintiff a "non-punitive letter of caution" on March 29, 2002 advising Plaintiff that she needed to adjust her leadership style.  Plaintiff states that she was never given this letter.

Defendants do concede that Havel told Plaintiff that she had his support.  Additionally, Defendants acknowledge that Havel conducted a performance evaluation in July 2002 rating Plaintiff's performance as "outstanding."  Defendants assert, however, that the positive evaluation was given in spite of Plaintiff's shortcomings in order to provide positive motivation.  Defendants

---

[1]There is a disputed issue with regard to Plaintiff's date of hire into this position. Plaintiff's termination was effective January 10, 2003.  The San Juan County Personnel Handbook provides for a one-year trial period for newly hired employees and employees who are transferred or promoted to new positions.  During the one-year trial period, an employee is an "at will" employee whose employment may be terminated without cause or advance notice.  Because Plaintiff's effective hiring date is in dispute, it is not clear whether Plaintiff was terminated during her trial period and was thus an "at will" employee or whether she was terminated after the end of the trial period.

point out that the evaluation noted "employee counseling" as a weak point in Plaintiff's

performance and included as a goal that Plaintiff attend formal training for supervisors.

   Plaintiff testified at her deposition that she met with Havel on August 12, 2002, and he

told her that Jack Fortner, a San Juan County Commissioner, wanted her fired.  Plaintiff also

avers that Havel told her that Fortner had said that Plaintiff was making too much money and that

he had the right man for her job.  By Defendants' account, Fortner had received complaints about

Plaintiff's abrasiveness and had told Havel that Plaintiff was being paid too much to be rude.  On

August 15, 2002, Havel issued a letter to Plaintiff in which he counseled her that, over several

months, he had received complaints that Plaintiff's demeanor was abrasive.  Defendants state that

Plaintiff was cautioned that her conduct was unacceptable and would not be tolerated.  According

to Defendants, Plaintiff was told she would be reevaluated in 90 days.

   At some point during Plaintiff's tenure at the DWI facility, County officials became aware

of accounting discrepancies at the DWI facility.  According to Plaintiff, this occurred in April

2001 when she uncovered discrepancies in receipts and took them to Havel.  Plaintiff states that

she recommended a criminal investigation or independent audit but that County officials chose

instead to conduct an internal audit.  An internal audit was completed in October or November of

2002 and revealed that a DWI facility employee had embezzled approximately $130,000.

According to Plaintiff, this investigation and audit were not conducted in an expedient manner.

According to Defendants, the embezzlement was reported to the San Juan County District

Attorney for criminal investigation as soon as the audit was completed.

   While this internal audit was being performed, Plaintiff questioned a $93,000 expenditure

in fiscal year 2000 from the state funded DWI grant for electronic monitoring "ankle bracelets"

3

that were used for a County program unrelated to the DWI facility.  Sue MaGaha, the accountant

for the DWI grant, told Plaintiff that there was nothing inappropriate about the expenditure.

Before the County's internal audit was completed, the New Mexico Legislative Finance

Committee (LFC) randomly selected the County for an audit to determine if state appropriated

funds were being properly utilized.  The LFC was conducting the audit with the Department of

Finance Association (DFA).  Plaintiff contacted Tom Dailey, Assistant County Attorney, about

whether she should disclose the embezzlement and the County's internal audit to the LFC and

DFA auditors.  Dailey advised Plaintiff to contact the district attorney's office and follow their

direction.  The district attorney's office advised Plaintiff to inform DFA of the embezzlement

audit.  Havel was aware that Plaintiff had been directed to disclose the embezzlement audit to the

LFC and DFA auditors.

Plaintiff contacted DFA and informed them of the embezzlement audit.  The LFC/DFA

audit began in late September or early October, 2002.  During a tour of the DWI facility by the

DFA/LFC auditors, Plaintiff showed auditors the cells used for "courtesy holds" and explained to

the auditors that these were used to incarcerate non-DWI offenders.  On October 3rd or 4th,

2002, the LFC/DFA auditors discovered the $93,000 expenditure for "ankle bracelets" on their

own.  Plaintiff concedes she did not disclose this expenditure to the auditors.

The DFA/LFC auditors went to Sue MaGaha and told her that she was not allowed to

spend DWI grant money or invest DWI grant money outside the DWI program.  The final

DFA/LFC audit report stated that DWI funds should not be used to provide courtesy holds.  The

record contains no information indicating when the audit was completed or when the final audit

report was issued.

4

Plaintiff states that the County was not pleased that the embezzlement audit was disclosed to the LFC/DFA auditors.  Plaintiff provides evidence that Havel told her that another County official had called Plaintiff a traitor to the County.  Additionally, Plaintiff testified at her deposition that Defendant Tony Atkinson, County Manager, asked Havel whether Plaintiff would have disclosed the "courtesy holds" at the DWI facility to the DFA/LFC auditors.

Defendants counter that the disclosure of the embezzlement was done with Havel's knowledge.  Further, Havel attests that he did not know that Plaintiff had shown the DFA/LFC auditors the "courtesy holds."  He further states that he was not aware of any other disclosures by Plaintiff to the DFA/LFC auditors regarding improper County expenditures.

At some point in May 2002, Plaintiff reported to Havel that she believed one of her subordinates, a Native American woman named Wanda, had appeared on the job looking "stoned."  Plaintiff testified at her deposition that Havel told her not to ask Wanda to be tested for substances because he was afraid Wanda would sue for discrimination.  On December 3, 2002, Plaintiff had a young person in the DWI facility on a courtesy hold who needed to be transferred to another type of treatment facility.   It was Wanda's responsibility to arrange a transfer.  The young person told Plaintiff that Wanda was doing nothing with regard to getting him transferred.  Plaintiff took the young person to her office and asked Wanda to join them.  The young person began asking Wanda about the appearance of Wanda's eyes - asking her what was wrong and what was going on.  Plaintiff excused the young person from her office and asked Wanda if she had been drinking.  Wanda denied using alcohol.  Wanda later informed Havel that she wanted to initiate a grievance against Plaintiff.

5

On December 17, 2002, Plaintiff drafted a memo addressed to all case managers at the DWI facility.  The memo stated that the case managers had been performing their duties in an unsatisfactory manner, and that they had been resistant and disrespectful toward her in light of their complaints and criticism of her.  Plaintiff gave this memo to Havel for his review, but the memo was never distributed to the case managers.  On December 18, 2002, Havel met with the case managers for input on Plaintiff's management style.  The case managers complained that Plaintiff was tactless, degrading, and created a hostile work environment in which the case managers felt their jobs were always on the line.  Havel informed the case managers that he was planning a change in management.

After the December 18, 2002 meeting, Havel informed Plaintiff that he was investigating accusations against her.  Havel advised Plaintiff that she should take leave, should not come into the DWI facility, and should not talk to DWI facility employees.  Plaintiff was on leave from December 20, 2002 until January 3, 2003.  On January 2, 2003, Havel told Plaintiff she was being removed as Acting Manager of the DWI facility and told her to contact Human Resources for reassignment as a detention officer.  On January 10, 2003, Havel sent Plaintiff a Notice of Termination.  The notice stated that Plaintiff was being terminated for having an ineffective leadership style as Acting Manager of the DWI facility.  Defendants state that Havel alone was responsible for the decision to terminate Plaintiff's employment.  Plaintiff states that she does not believe Havel had the discretionary authority to terminate her and that Fortner and Atkinson participated in the decision to terminate her employment.

Plaintiff's position was ultimately filled by a younger male.  Plaintiff states that she was told by the County Human Resources (HR) Manager that Plaintiff was being discriminated against

6

because she is female and over the age of 40.  Plaintiff recorded the conversation between the HR Manager and herself.  Defendants' transcription of that conversation shows that the HR Manager expressed her opinion that the new DWI Manager was selected because he was a man.

Plaintiff filed her Complaint in this case on July 29, 2003.  In Count I, Plaintiff alleges gender discrimination in violation of Title VII.  In Count II of the Complaint, Plaintiff alleges age discrimination in violation of ADEA.  Count III of the Complaint alleges Wrongful Retaliatory Discharge.  Plaintiff's Response to the Motion for Summary Judgment makes clear that this is a claim made pursuant to state tort law.  Count IV is a Breach of Contract claim.  In Count V, Plaintiff alleges that Defendants breached the Implied Covenant of Good Faith and Fair Dealing.  Count VI alleges a violation of the Equal Protection Clause of the Fourteenth Amendment.  Count VII is a claim under 42 U.S.C. § 1983 for the alleged violation of Plaintiff's First Amendment rights.

Defendants filed the instant Motion for Summary Judgment arguing that Plaintiff's claims under Title VII and the ADEA fail because (1) Plaintiff cannot make out her prima facie case of discrimination because she was not performing satisfactory work; (2) Plaintiff cannot make out a prima facie case because she cannot show circumstances giving rise to an inference of discrimination given the "same actor" inference that arises from the fact that she was hired and fired by the same person; and (3) Defendants have a legitimate, non-discriminatory reason for termination Plaintiff's employment, and Plaintiff's evidence does not show pretext.  Defendants urge that Plaintiff's claim for wrongful retaliatory discharge and her First Amendment claim fail because Plaintiff's disclosures to the LFC/DFA auditors were authorized by the County and because Plaintiff cannot show that she actually made some of the disclosures.  Defendants also

7

argue that the First Amendment claim fails because Plaintiff cannot show that her protected

speech was a substantial or motivating factor in the decision to terminate Plaintiff's employment

and cannot show that Defendants' proffered reason for her termination is pretextual.  With regard

to Plaintiff's contract claims, Defendants contend that Plaintiff had no contractual right to be free

from discrimination.  Defendants assert that Plaintiff's claim for violation of the Equal Protection

Clause of the Fourth Amendment fails because it is a claim based on a "class of one" theory, and

Plaintiff cannot show that she was treated differently from others similarly situated without a

rational basis for the differential treatment.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law.  Worrell v. Henry, 219 F.3d 1197,

1204 (10th Cir. 2000).  In ruling on a motion for summary judgment, a Court does not weigh the

evidence, but determines whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

Jeffries v. State of Kansas, 147 F.3d 1220, 1228 (10th Cir. 1998).  In making this determination,

the Court must construe all the facts in the record and reasonable inferences that can be drawn

from those facts in a light most favorable to the nonmoving party.  Worrell, 219 F.3d at 1204;

Jeffries, 147 F.3d at 1228.

**DISCUSSION**

**I.      PLAINTIFF'S CLAIMS UNDER TITLE VII AND THE ADEA**

The three-stage McDonnell Douglas burden shifting analysis applies to claims of

discrimination under Title VII and the ADEA when no direct evidence of discrimination exists.

See Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1315-16 (10th Cir. 1999) (applying

McDonnell Douglas framework to Title VII and ADEA disparate treatment and retaliation claims)

overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).  To

survive summary judgment on a claim of discriminatory discharge under Title VII or the ADEA,

Plaintiff bears the initial burden of proving a prima facie case of discrimination by showing that 1)

she is a member of a protected class; 2) she was qualified for her job; 3) despite her qualifications,

she was terminated; and 4) her position was not eliminated after her discharge.  See Bullington,

186 F.3d at 1315-16 (requiring same showing for prima facie case of discrimination under Title

VII and ADEA); Kendrick v. Penske Transp. Serv., Inc., 220 F.3d 1220, 1229 (10th Cir. 2000)

(setting forth the prima facie case for a plaintiff claiming discriminatory discharge).  Once a

Plaintiff establishes a prima facie case of discrimination, the employer must offer a facially

nondiscriminatory reason for its employment decision.  McDonnell Douglas Corp. v. Green, 411

U.S. 792 (1973); Perry v. Woodward, 199 F.3d 1126, 1135 (10th Cir. 1999).  It then becomes

the Plaintiff's burden to show that there is a genuine dispute of material fact as to whether the

employer's proffered reason for the challenged action is pretextual.  Perry, 199 F.3d at 1135;

Ingels v. Thiokol Corp., 42 F.3d 616, 622 (10th Cir. 1994).

There is no dispute that Plaintiff was female and over the age of 40 at all times relevant to

this case and was thus a member of a protected class under both Title VII and the ADEA.  It is

also undisputed that she was discharged and that her position was not eliminated after her

discharge.

Defendants do dispute that Plaintiff meets the second element of her prima facie case and

argue that she has not shown she was qualified for her job.  Defendants actually set forth the

9

second element of Plaintiff's prima facie as requiring that Plaintiff show she was qualified for her job and was doing satisfactory work.  Defendants cite to Shapolia v. Los Alamos Nat'l Lab., 992 F.2d 1033, 1038 (10th Cir. 1993) for this particular statement of the second prima facie element. Defendants then urge that Plaintiff cannot make a prima facie showing of discrimination because she cannot show that she was performing satisfactory work in light of Defendants' evidence of Plaintiff's poor job performance.

"The burden of establishing a prima facie case . . . is not onerous."  Brinkley-OBU v. Hughes Training, Inc., 36 F.3d 336, 343 (4th Cir. 1994).  It is well established that an employer's asserted reasons for taking adverse employment action are not appropriately brought as a challenge to the sufficiency of plaintiff's prima facie case.  Kenworthy v. Conoco, Inc., 979 F.2d 1462, 1470 (10th Cir. 1992).  In MacDonald v. Eastern Wyoming Mental Health Ctr., 941 F.2d 1115 (10th Cir. 1991), the defendant attempted the same argument as Defendants put forth here. In that case, the employer argued that the plaintiff's job performance had been unsatisfactory and thus the plaintiff could not make a prima facie showing that he was qualified for his job.  The Tenth Circuit stated that using a defendant's stated reasons for the challenged employment action in the prima facie case cut off a plaintiff's opportunity to show that the proffered reasons for the adverse action were pretextual.  Id.  Thus, it is an erroneous analysis to judge Plaintiff's qualifications based on the Defendants' proffered reasons for Plaintiff's discharge.

The above analysis begs the question, then, what is Plaintiff required to show to establish that she was qualified for her job?  In Kenworthy, the Tenth Circuit stated that in a discriminatory discharge case, Plaintiff need only show that she continued to possess the objective qualifications she held when she was hired.  979 F.2d at 1469.  Thus, even when disputed by the employer, a

plaintiff's own testimony that her work was satisfactory will suffice to satisfy the second prong of the prima facie case.  Id.  Additionally, the second prong may be inferred when there is evidence that a plaintiff held a position for a significant period of time.  MacDonald, 941 F.2d at 1121. From the evidence in this case, I am able to determine that Plaintiff has shown that she continued to possess the objective qualifications for her job at the time of her discharge and has thus met her burden to show that she was qualified for her job.

Plaintiff has made a showing of the traditional prima facie case of discrimination. Defendants urge, however, that Plaintiff fails to make a prima facie showing of discrimination because Mr. Havel both hired and terminated Plaintiff's employment.  Defendants argue that this "same actor" inference defeats Plaintiff's prima facie case because it creates an inference that Plaintiff's discharge did not occur under circumstances giving rise to an inference of discrimination.  I conclude that it would be improper to consider Defendants' "same actor" inference argument in determining whether Plaintiff has made out a prima facie case of discrimination as to do so would impose an additional, overarching element into Plaintiff's prima facie case.  Defendants' same actor inference argument is more appropriately considered in the final stage of the McDonnell Douglas analysis.  See Proud v. Stone, 945 F.2d 796, 798 (4th Cir. 1991) (stating that "[t]he relevance of the fact that the employee was hired and fired by the same person within a relatively short time span comes at the third stage of the [McDonnell Douglas] analysis," and clarifying that the inference created is that the employer's stated reason for the adverse action is not pretextual.)  Thus, Plaintiff has satisfied her initial burden of showing a prima facie case of discrimination.

In accordance with the McDonnell Douglas framework, the burden is on Defendants to articulate a legitimate, non-discriminatory reason for discharging Plaintiff. Defendants state that Plaintiff was discharged because she was unable to get along with her subordinates and other employees and was unable to create a productive working environment. Defendants have met their burden of production under the McDonnell Douglas framework.

The burden thus shifts back to Plaintiff to show that Defendants' proffered reasons are a pretext for discrimination. A plaintiff demonstrates that an employer's reasons for an adverse employment action are pretextual by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of belief. Bullington, 186 F.3d at 1317. A plaintiff need not always present additional evidence in order to show pretext; a plaintiff's prima facie case may itself cast sufficient doubt on a defendant's proffered nondiscriminatory reasons to satisfy his burden of showing pretext. English v. Colorado Dept. of Corrections, 248 F.3d 1002, 1009 (10th Cir. 2001). If the Court accepts Defendants' "same actor" inference argument and applies the inference in this case, Plaintiff's attempt to show that Defendants' proffered reasons are a pretext for discrimination must be examined in light of an inference that discrimination was not a motivating factor in Defendants' decision to terminate Plaintiff's employment.

The origin of Defendants' "same actor" inference theory appears to be the Fourth Circuit opinion in Proud v. Stone, 945 F.2d 796 (4th Cir. 1991). In Proud, the plaintiff, 68 year-old Mr. Proud, was hired by Klauss for a civilian position with the United States Department of the Army on June 14, 1985. On October 16, 1985, Klauss recommended that Mr. Proud be discharged, and Mr. Proud was discharged effective October 28, 1985. Mr. Proud filed his lawsuit alleging age

discrimination.  The case went to trial, and the trial court dismissed the case at the close of the

plaintiff's evidence.  On appeal, the Fourth Circuit affirmed the trial court's dismissal on the basis

that Mr. Proud had failed to show that age was a motivating factor for his discharge.  Id. at 798.

The Fourth Circuit focused on the fact that Klauss had both hired and fired Mr. Proud, and that

Mr. Proud was discharged less than six months after he was hired.  Id.  The court stated that "in

cases where the hirer and the firer are the same individual and the termination of the employment

occurs within a relatively short time span following the hiring, a strong inference exists that

discrimination was not a determining factor for the adverse action taken by the employer."  Id. at

797.

       The "same actor" inference has not been expressly adopted by the Tenth Circuit.  The

United States District Court for the District of Kansas has recognized that an inference of

nondiscrimination arises when the same person hires and fires a plaintiff within a short time span.

Schindler v. Bierwirth Chrysler/Plymouth, Inc., 15 F.Supp.2d 1054 (D. Kan. 1998).  In Eslinger

v. U.S. Cent. Credit Union, 866 F.Supp. 491, 499 (D. Kan. 1994), the court found that, while the

defendant's "same actor" evidence severely undercut the plaintiff's discrimination claim, it did not

make the claim irrational in light of other evidence, and there was sufficient evidence from which

a reasonable jury could conclude that discrimination played a role in the defendant's decision to

terminate the plaintiff's employment.  In Schindler, the court found that the "same actor"

inference did not apply because there was evidence that there were persons involved in the

decision to terminate the plaintiff's employment that were not involved in the decision to hire.  15

F.Supp.2d at 1058.  The court also found that, even if the inference did apply, the plaintiff's claim

would survive summary judgment in light of the other evidence.  Id.

In this case, Plaintiff argues that persons other than Havel were involved in the decision to terminate her employment. Plaintiff provides some evidence to support this in her deposition testimony that Havel told her that Fortner wanted her fired and had the right man for her job.[2] Because there is evidence that there were individuals other than Havel may have been involved in the decision to terminate Plaintiff, the "same actor" inference does not apply in this case and Plaintiff need not overcome this inference in showing that a reasonable jury could find Defendants' proffered reasons for her discharge are a pretext for discrimination.

Plaintiff's evidence suggestive of a discriminatory motive, in addition to that used to make her prima facie case, includes Havel's statement to Plaintiff that Fortner wanted her fired and had the right man for her job, the fact that Plaintiff's position was filled by a younger man following her termination, and the statement by the HR manager that the person hired to fill Plaintiff's position was hired because he was a man. From this evidence, a reasonable jury could conclude that Plaintiff's termination was motivated by gender discrimination and that Defendants' proffered reasons for Plaintiff's termination are a pretext for gender discrimination. Therefore, Defendants are not entitled to summary judgment with regard to Plaintiff's claim under Title VII as stated in Count I of Plaintiff's Complaint.

While Plaintiff's evidence is sufficient to create a genuine issue of material fact with regard to her Title VII claim, the evidence is insufficient to create a genuine issue of material fact with regard to whether Defendants' proffered reasons are a pretext for age discrimination. There is no evidence that Plaintiff's termination was motivated by age discrimination beyond the fact that

---

[2]Plaintiff's deposition testimony also states that Plaintiff believes Fortner and Atkinson were involved in the decision to terminate her employment and that she does not believe Havel had the discretion to terminate her employment. However, Plaintiff's beliefs are not evidence.

Plaintiff is over 40 and the person who replaced her is younger than she.  This is insufficient

evidence from which a reasonable jury could conclude that Defendants terminated Plaintiff's

employment based on her age.  See Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 462

(6th Cir. 2004); Fagan v. New York State Elec. & Gas Corp., 186 F.3d 127, 134 (2nd Cir. 1999);

La Montagne v. American Convenience Prod., Inc., 750 F.2d 1405 (7th Cir. 1984).  Accordingly,

Defendants are entitled to summary judgment on Plaintiff's claim under the ADEA as stated in

Count II of Plaintiff's Complaint.

## II.    PLAINTIFF'S WRONGFUL RETALIATORY DISCHARGE AND FIRST AMENDMENT CLAIMS

Plaintiff's wrongful retaliatory discharge claim and First Amendment claim both allege that

Plaintiff was terminated in retaliation for raising issues of fiscal misconduct.  Defendants argue

that they are entitled to summary judgment on both claims because Plaintiff cannot factually

support either claim.  Defendants also argue that Plaintiff's First Amendment claim must fail

because Plaintiff cannot make a prima facie case of First Amendment retaliation and cannot show

that Defendants' proffered reasons for her discharge are a pretext for First Amendment

retaliation.

### A.    Plaintiff's First Amendment Retaliation Claim

A First Amendment retaliation claim is evaluated using a well-established four part inquiry

in which (1) the Court determines whether the Plaintiff's speech involves a matter of public

concern; and, if so (2) the Court balances the Plaintiff's interest in commenting on matters of

public concern against the interests of the Defendants, as employers, in promoting the efficiency

of the public services it performs through its employees; then, if the balance tips in favor of the

Plaintiff (3) the Plaintiff must show that the speech was a substantial or motivating factor in a detrimental employment decision; then, if the Plaintiff establishes that the speech was a factor, (4) the Defendants may demonstrate that they would have taken the same action with regard to Plaintiff even in the absence of the protected speech.  Finn, 249 F.3d at 1246; Lybrook v. Farmington Municipal Schools Bd. of Educ., 232 F.3d 1334 (10th Cir. 2000).

Defendants urge that Plaintiff's First Amendment retaliation claim fails because her only speech was her disclosure to DFA/LFC auditors of the internal embezzlement audit, and Defendants knew of and authorized this disclosure.  Plaintiff counters that, even if the LFC/DFA auditors discovered some of the financial irregularities on their own, Plaintiff was perceived as a traitor by County officials who believed that Plaintiff had made other disclosures of fiscal mismanagement such as the use of DWI funds for "ankle bracelets."

The first issue raised by the parties' arguments is whether a First Amendment claim will lie when an employee does not actually engage in protected speech but is discharged from employment because the employer erroneously believes the employee did engage in protected speech.  The courts that have addressed the question have found that a First Amendment claim requires actual speech.  In Jones v. Collins, 132 F.3d 1048 (5th Cir. 1998), a plaintiff brought a First Amendment claim against her employer school district when she was given a poor performance rating and was transferred after someone disclosed the district's consideration of placing an alternative education program at a specific school.  While the school district admittedly believed the plaintiff had made the disclosure, she had not, in fact, made any disclosure.  The Fifth Circuit determined that an employer's retaliation against an employee based on an erroneous

16

perception that the employee engaged in protected speech is not a constitutional violation absent any actual speech.  Id. at 1053-54.

In Fogarty v. Boles, 121 F.3d 886 (3rd Cir. 1997), a school teacher sued a school principal alleging that he was punished due to the principal's mistaken belief that the teacher had reported to the press a matter of public interest at the school.  The Third Circuit held that, given the teacher's denial that he contacted the press or had any intention to contact the press, the First Amendment claim failed.  Id. at 891.  In reaching this conclusion, the court noted that there are various statutes and regulations prohibiting retaliation that may be violated when an employer discharges an employee based on an erroneous belief about the employee's conduct.  Id. at 890.  Citing the Supreme Court decision in Waters v. Churchill, 511 U.S. 661 (1994), the Third Circuit noted that "statutory rights and constitutional rights in the employment context are not coextensive," and, while statutes may provide protections not offered under the Constitution, the protection for speech in the First Amendment only protects actual speech.  Fogarty, 121 F.3d at 890, 891.

In Barkoo v. Melby, 901 F.2d 613 (7th Cir. 1990), a plaintiff alleged that her employer retaliated against her in violation of the First Amendment because her employer erroneously believed she had engaged in protected speech by giving information to a newspaper.  The plaintiff had not actually been the source for the newspaper story.  The Seventh Circuit held that the First Amendment right of free speech cannot be violated when speech does not occur.  Id. at 618-19.

In Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287 (1977), the Supreme Court held that a plaintiff alleging retaliation based upon the plaintiff's exercise of her First Amendment rights bears the burden of showing, among other things, that her

17

conduct was constitutionally protected.  In <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983), the

Court pointed out that in the absence of protected speech, a public employee may be discharged

even if the action is unfair, or the reasons "are alleged to be mistaken or unreasonable."

"[G]overnment officials should enjoy wide latitude in managing their offices, without intrusive

oversight by the judiciary in the name of the First Amendment."  <u>Id.</u>  "Every § 1983 case relating

to workplace freedom of speech, from <u>Connick</u> on down, discusses the actual speech engaged in

by the employee."  <u>Barkoo</u>, 901 F.2d at 619.  I conclude that Plaintiff's First Amendment

retaliation claim may be based only on Plaintiff's actual speech and cannot encompass the

Defendants' alleged erroneous beliefs that Plaintiff disclosed matters that Plaintiff did not actually

disclose.

   Parties agree that Plaintiff disclosed the internal embezzlement audit to the LFC/DFA

auditors.  Plaintiff's evidence is sufficient to show, for purposes of opposing Defendant's motion,

that Plaintiff also disclosed the function and practice behind the "courtesy holds" at the DWI

facility.  Defendants do not argue that these disclosures are not speech on matters of public

concern.  Rather, Defendants argue that the embezzlement disclosure cannot be the basis of

Plaintiff's claim because Defendants knew about the disclosure and authorized it.

   The fact that Defendants knew about Plaintiff's disclosure of the internal embezzlement

audit does not defeat Plaintiff's claim.  Defendants' knowledge or awareness is actually necessary

to the claim - an employer cannot retaliate against an employee for the employee's conduct unless

the employer had some awareness of the conduct.  <u>See e.g.</u>, <u>Morris v. Lindau</u>, 196 F.3d 102 (2nd

Cir. 1999) (plaintiff failed to show First Amendment retaliation when she failed to present any

evidence that officials knew about her alleged speech); <u>Stagman v. Ryan</u>, 176 F.3d 986 (7th Cir.

18

1999) (plaintiff failed to show his termination was in retaliation for union activities when there was no evidence his employer had any awareness of the union activities); <u>Cabrol v. Town of Youngsville</u>, 106 F.3d 101 (5th Cir. 1997) (town employee's termination was not in retaliation for discussions with town council when there was no evidence the person who terminated him was aware of the discussions).  Whether Defendants were truly heartened by Plaintiff's disclosure or were resentful of it is an issue of fact for the trier of fact.

Defendants do not expressly address Plaintiff's disclosure of the DWI facility "courtesy holds," but argue generally that Plaintiff cannot make a prima facie case of First Amendment retaliation and cannot show that Defendants' proffered reasons for discharging Plaintiff are a pretext for First Amendment retaliation.  Defendants' arguments rest on their assertion that the <u>McDonnell Douglas</u> burden shifting framework applies to First Amendment claims.  Defendants cite to recent Sixth and Seventh Circuit cases for the proposition that <u>McDonnell Douglas</u> provides the appropriate analytical framework in this case.

There has been speculation in other circuits that the Supreme Court decision in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989), should be interpreted as guidance to apply the <u>McDonnell Douglas</u> framework to certain First Amendment cases.  <u>See e.g.</u>, <u>McMillian v. Svetanoff</u>, 878 F.2d 186,190, n.3 (7th Cir. 1989).  This Court finds no cases from the Tenth Circuit in which the <u>McDonnell Douglas</u> framework has been applied in a First Amendment case in lieu of the balancing test set forth in <u>Pickering v. Bd. of Education</u>, 391 U.S. 563 (1968). Thus, the Court concludes that the law of the Tenth Circuit continues to be that First Amendment cases are analyzed under the <u>Pickering</u> balancing test.

Defendants, as the movants for summary judgment, bear "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Before the burden shifts to Plaintiff to demonstrate a genuine issue, Defendants must meet their initial burden of demonstrating that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law.  Id.

By utilizing the incorrect legal analysis, Defendants in this case have failed to demonstrate that they are entitled to judgment as a matter of law.  Therefore, they are not entitled to summary judgment with regard to Plaintiff's First Amendment claim.

      B.      Plaintiff's Retaliatory Discharge Claim

While a First Amendment claim must be based on Plaintiff's actual speech, it is not clear whether the New Mexico tort of retaliatory discharge must be based only on Plaintiff's actual speech or whether it may also be based on Defendants' alleged erroneous perception of Plaintiff's speech.  When federal courts are faced with the task of interpreting state law, they must look to rulings of the highest state court, and if no such rulings exist, must endeavor to predict how the high court would rule.  Johnson v. Riddle, 305 F.3d 1107, 1118 (10th Cir. 2002); Lampkin v. Little, 286 F.3d 1206, 1210 (10th Cir. 2002).  When attempting to predict how a state's highest court would rule on an issue of state law, a federal court may consider all available resources, including decisions of lower courts in the state, decisions of other state courts and federal courts, and the general weight and trend of authority.  F.D.I.C. v. Schuchmann, 235 F.3d 1217 (10th Cir. 2000).

New Mexico courts have not addressed whether a wrongful retaliatory discharge claim will lie based on an employer's erroneous belief that an employee engaged in conduct that, had it occurred, would have been authorized or encouraged by public policy.  Therefore, this Court must look to other resources to predict how the New Mexico Supreme Court would rule on this issue.

Under the Occupational Safety and Health Act (OSHA), an employer is prohibited from discriminating against an employee who exercises his or her rights under the Act.  29 U.S.C. § 660(c).  In Reich v. State Credit, Inc., 897 F.Supp. 1014 (N.D. Ohio 1995), an employee alleged that she was fired because her employer mistakenly believed she had filed safety related complaints with a building authority.  The employer moved for summary judgment on the basis that the employee had not engaged in any protected activity.  The court ruled that the employee need not have engaged in protected activity to survive summary judgment and that it was a violation of Section 660(c) for an employer to discharge an employee based on a mistaken belief that the employee had engaged in protected conduct.  Id. at 1016.

The Fair Labor Standards Act (FLSA) also prohibits employer retaliation against employees who engage in conduct to protect their rights under the Act.  29 U.S.C. § 215(a)(3).  In Saffels v. Rice, 40 F.3d 1546, 1549-50 (8th Cir. 1995), the Eighth Circuit held that an employer violates the FLSA when it discharges an employee based on a mistaken belief that the employee reported a violation of the FLSA.  In so holding, the court noted that the purpose of the anti-retaliation provision of the FLSA is "not merely to vindicate the rights of complaining parties, but to foster an environment in which employees are unfettered in their decision to voice grievances without fear of economic retaliation or reprisal."  Id. at 1549.  Similarly, in Brock v.

21

Richardson, 812 F.2d 121, 125 (3rd Cir. 1987), the Third Circuit held that the discharge of an

employee in the mistaken belief that the employee has engaged in protected activity under the

FLSA is a violation of the FLSA anti-retaliation provision.  In reaching this conclusion, the court

noted that the purpose of the anti-retaliation provision is to encourage employees to report

suspected FLSA violations.  Id. at 124.  The court then stated that a discharge based on an

employer's mistaken belief that an employee has engaged in protected conduct creates the same

atmosphere of intimidation as a discharge based on actual protected conduct.  Id. at 125.

   The State of Wisconsin has a statute protecting government employees from retaliation.

Wis. Stat. Ann. § 895.65.  This statute prohibits retaliation when the employee exercises First

Amendment rights or when the employer believes the employee has exercised such rights.  §

895.65(2).  Thus, the Wisconsin statute expressly protects employees from retaliation when an

employer erroneously believes an employee has exercised First Amendment rights.

   The State of Michigan has a Whistleblower's Protection Act (WPA) that contains an anti-

retaliation provision.  Mich. Comp. Laws § 15.362 (Mich. Stat. Ann. § 17.428(2)).  In Chandler

v. Schlumberger, a split panel of the Michigan Court of Appeals held that a prima facie case of

retaliation under the WPA requires a plaintiff to show that she actually engaged in protected

activity, and it is not a violation of the WPA for an employer to terminate an employee based on

an erroneous perception that the employee engaged in protected activity.  542 N.W.2d 310, 311

(Mich. App. 1996).  The court reasoned that the purpose of the WPA was to encourage

employees to report violations of the law, not to prevent discrimination by employers.  Id. at 314.

The court stated that the focus of the WPA is on the conduct of the employee and not the motive

or intent of the employer.  Id.  The court found that an employee who was unwilling or unable to

report a violation of the law should not be afforded the protection of the anti-retaliation provision of the WPA, and that affording such protection would not further the WPA's purpose of encouraging such reporting and might even discourage such reporting.  Id.  In a dissenting opinion, Judge Shelton strongly disagreed with the reasoning of the majority and stated his view that allowing an employer to terminate an employee when it believes the employee has engaged in protected conduct will discourage other workers from actually reporting violations of the law.  Id. at 317 (Shelton, J. dissenting).

The State of Kansas recognizes a cause of action for retaliatory discharge based on protected conduct when an employer mistakenly believes that an employee engaged in protected conduct and terminates the employee for that reason.  In Pilcher v. Bd. of County Comm'rs of Wyandotte County, the Kansas Court of Appeals found that a public employee who was discharged because the county incorrectly believed she was the source for a negative newspaper article was entitled to damages for an unlawful discharge.  787 P.2d 1204, 1208 (Kan. App. 1990) overruled on other grounds, Dennis v. Ruskowitz, 873 P.2d 199 (Kan. App. 1994).  The court stated that a discharge is made wrongful when the motivation for the discharge is unlawful without regard to whether the employee actually was the source of the newspaper article.  Pilcher, 787 P.2d at 1209.  In Larson v. Ruskowitz, the Kansas Supreme Court expressly approved the holding in Pilcher that a cause of action for retaliatory discharge will lie if an employer believes an employee engaged in protected conduct and terminates the employee for that reason.  850 P.2d 253, 261 (Kan. 1993).

All of the cases examined by the Court, with the exception of the Kansas cases, involved statutory interpretation.  Like the retaliatory discharge action in Kansas, the New Mexico tort of

retaliatory discharge has its genesis in the judicial recognition of the erosion of the employment at-will rule.  <u>Vigil v. Arzola</u>, 699 P.2d 613 (N.M. App. 1983) (first recognizing the tort of retaliatory discharge).  Because the tort has evolved out of judicial decisions, there is no statute for this Court to parse in order to determine whether an employer commits the tort when it discharges an employee based on a mistaken belief that the employee engaged in conduct that public policy would authorize or encourage.  The Court must rely solely on New Mexico case law to determine whether the New Mexico Supreme Court would agree with the majority of jurisdictions that an employer's termination based on a mistaken belief is wrongful or whether the New Mexico Supreme Court would agree with two members of the Michigan Court of Appeals.

     New Mexico cases have repeatedly stated that, in order to succeed on a claim for retaliatory discharge, an employee must show that she was discharged because she performed acts that public policy authorized or encouraged, or because she refused to do something required by her employer that public policy would condemn.  <u>See</u> <u>Garrity v. Overland Sheepskin Co. of Taos</u>, 917 P.2d 1382, 1386 (N.M. 1996).  Thus, it initially appears that the New Mexico tort of retaliatory discharge, like the Michigan WPA, focuses solely on the conduct of the employee. However, New Mexico cases have also expressly stated that the linchpin of a retaliatory discharge case is whether an employer violated public policy by discharging an employee, <u>Michaels v. Anglo American Auto Auctions, Inc.</u>, 869 P.2d 279, 280 (N.M. 1994), and that the employer's motive is a key element for a claim of retaliatory discharge, <u>Weidler v. Big J Enterprises, Inc.</u>, 953 P.2d 1089, 1097 (N.M. App. 1997), <u>Lihosit v. I & W, Inc.</u>, 913 P.2d 262, 265 (N.M. App. 1996). This focus on the motivation of the employer distinguishes the New Mexico tort from the Michigan WPA.  This distinction coupled with the weight of authority from other jurisdictions

24

leads me to conclude that the New Mexico Supreme Court would hold that an employer has committed the tort of retaliatory discharge if it terminates an employee based on a mistaken belief that the employee has engaged in conduct that public policy would authorize or encourage.

Defendants' only apparent argument in support of summary judgment on Plaintiff's retaliatory discharge claim was the contention that Plaintiff could not factually support the claim because her only actual disclosure to the DFA/LFC auditors was the internal embezzlement audit and this disclosure was authorized.  Because the retaliatory discharge claim need not be based solely on this disclosure, and because there are fact issues regarding Defendants' state of mind with regard to the disclosure of the embezzlement audit, Defendants are not entitled to summary judgment with regard to this claim.

III.   PLAINTIFF'S CLAIMS FOR BREACH OF CONTRACT AND BREACH OF THE
       COVENANT OF GOOD FAITH AND FAIR DEALING

Defendants' Motion for Summary Judgment argues that Plaintiff's Breach of Contract claim and "derivative" claim for breach of the covenant of good faith and fair dealing must be dismissed because both claims are based on the San Juan County Personnel Handbook Equal Opportunity policy statement, and such general policy statements cannot form the basis of a breach of contract claim.  Defendants offer no support for the contention that a claim for breach of the covenant of good faith and fair dealing is derivative of a breach of contract claim.  In support of their general argument regarding policy statements in personnel handbooks, Defendants cite to state court cases from Maryland and Minnesota and two federal cases, including a Tenth Circuit case, interpreting Colorado state law.

The breach of contract claim and claim for breach of the covenant of good faith and fair dealing are obviously state law claims to which the law of the State of New Mexico would apply. Defendants made no effort to brief the Court on New Mexico decisional law regarding policy statements in personnel handbooks. Even if the New Mexico courts had never addressed the issue, Defendants should have made this known to the Court and given some indication why this Court should find the cases interpreting Maryland, Minnesota and Colorado law persuasive on the interpretation of New Mexico law. On summary judgment, the movant bears the initial burden of showing it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Defendants have failed to meet this initial burden with regard to Plaintiff's breach of contract claim and claim for the breach of the covenant of good faith and fair dealing.

IV.     PLAINTIFF'S EQUAL PROTECTION CLAIM

Defendants assert that Plaintiff's Equal Protection Claim is based solely on a "class of one" theory. Plaintiff's response states that she is not pursuing her class of one theory. The Court reads Plaintiff's Equal Protection Claim as possibly asserting more than a class of one theory of recovery in that it incorporates each and every allegation set forth in the preceding paragraphs, See Complaint ¶ 70, and the preceding paragraphs include Plaintiff's claim of gender discrimination, See Complaint ¶¶ 37 through 42. It is not clear to the Court whether Plaintiff's Response concedes the dismissal of the Equal Protection claim in its entirety or whether Plaintiff concedes only the class of one theory of recovery for that claim. Assuming that Plaintiff would have clearly argued against summary judgment for the Equal Protection claim if she intended to assert more than the class of one theory, the Court will grant Defendants' motion for summary

judgment on that claim. Plaintiff may file a motion for reconsideration on this ruling as to her equal protection claim if the Court has misinterpreted the parties' briefs on this issue.

**CONCLUSION**

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment [Docket No. 20] is hereby GRANTED IN PART as follows:

1.　The motion is GRANTED with respect to Plaintiff's claim under the ADEA as stated in Count II of Plaintiff's Complaint and this claim is accordingly DISMISSED; and

2.　The motion is GRANTED with respect to Plaintiff's Equal Protection claim in Count VI of the Complaint and this claim is accordingly DISMISSED.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment [Docket No. 20] is hereby DENIED IN PART as follows:

1.　The motion is DENIED with respect to Plaintiff's claim for gender discrimination in violation of Title VII as stated in Count I of Plaintiff's Complaint;

2.　The motion is DENIED with respect to Plaintiff's claim for wrongful retaliatory discharge as stated in Count III of Plaintiff's Complaint;

3.　The motion is DENIED with respect to Plaintiff's claim for breach of contract as stated in Count IV of Plaintiff's Complaint;

4.      The motion is DENIED with respect to Plaintiff's claim for breach of the

implied covenant of good faith and fair dealing as stated in Count V of

Plaintiff's Complaint; and

5.      The motion is DENIED with respect to Plaintiff's First Amendment claim

as stated in Count VII of Plaintiff's Complaint.


_____
UNITED STATES DISTRICT JUDGE

28